# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| STEPHANIE GOGGINS & MARCUS LACEY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 3:24-cv-00321 |
| v. | ) Judge Aleta A. Trauger |
| | ) |
| ALM PRINTERS, LLC d/b/a Hotel Indigo | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

Plaintiffs Stephanie Goggins and Marcus Lacey, who worked in hotel housekeeping, have sued their former employer, defendant ALM Printers, LLC ("Hotel Indigo"). The defendant has filed a Motion for Summary Judgment (Doc. No. 22), which, for the reasons set forth herein, the court will grant, and the case will be dismissed with prejudice.

## I. PROCEDURAL HISTORY

Goggins and Lacey allege race discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). (Doc. No. 1, Compl. ¶¶ 67–89.)[1] They ask the court to enjoin the defendant from further

---

[1] The Complaint appears to allege, in addition to discrimination on the basis of race, discrimination on the basis of skin color. (Compl. ¶ 67 ("Defendant discriminated against Plaintiffs . . . because of their race and color.").) The defendant argues that the plaintiffs have not "articulate[d] any independent basis for their color discrimination claims," which therefore fail as a matter of law. (Doc. No. 22-1 at 5 n.1.) The court agrees with the defendant: the Complaint does not contain any facts regarding skin color. Moreover, the plaintiffs' Response brief does not mention "color," let alone respond to the defendant on this point, so the court finds that the plaintiffs have abandoned any such claims of color-based discrimination. *See Kinsey v. Ohio*, No. 20-3315, 2021 WL 1100494, at *2 (6th Cir. Jan. 11, 2021) ("A plaintiff is deemed to have

violations of law, to reinstate them to their positions, and to award them damages and fees, among other relief. (Compl. 9.)

The defendant has filed a Motion for Summary Judgment (Doc. No. 22), accompanying Memorandum (Doc. No. 22-1), a Statement of Undisputed Material Facts ("SUMF") (Doc. No. 22-2), and Exhibits (Doc. Nos. 22-3 through 22-22), to which the plaintiffs have filed a Response[2] (Doc. No. 25), a Response to the defendant's Statement of Undisputed Material Facts ("RSUMF") (Doc. No. 26), and Exhibits (Doc. Nos. 27-1 through 27-26, 28-1, 28-2),[3] and in further support of which the defendant has filed a Reply (Doc. No. 30).

---

abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007))).

[2] The court granted a joint Motion (Doc. No. 20) allowing the parties to exceed the 20-page limit for briefs set by this court's Initial Case Management Order (Doc. No. 18 ¶ I). (Doc. No. 21 setting a 25-page limit.) The plaintiffs' Response brief is 29 pages. The defendant asks that the court disregard pages in excess of the limit. (Doc. No. 30 at 4.) While the defendant is right that the plaintiff was not entitled to file a 29-page brief, because the court will grant the defendant's Motion and dismiss this case, the court will deny its request as moot.

[3] The plaintiffs' Response brief and related filings were originally due on Friday, August 29, 2025—21 days after the defendant filed its Motion (Doc. No. 22) on August 8. (Doc. No. 18 ¶ I.) At 6:18 PM on Friday, August 29, plaintiffs' counsel filed an Unopposed Motion for a seven-day extension, until Friday, September 5. (Doc. No. 24 (acknowledging the deadline and requesting an extension due to illness and work responsibilities).) This court routinely grants unopposed extension requests, but when a party files an extension request after close of business on the deadline, the court does not have time to rule on the motion before the deadline passes. *Cf. A.A.R.P. v. Trump*, 137 F.4th 391, 394 (5th Cir. 2025) (Ho, J., concurring) ("We seem to have forgotten that this is a district court—not a Denny's."). The court granted the plaintiffs' extension request on September 8. (Doc. No. 29 (extending the plaintiffs' filing deadline to September 5).) By then, however, the plaintiffs had already filed their Response and most of their accompanying documents, including their RSUMF, *after* their proposed deadline—and the deadline the court later retroactively authorized—during the first hour of September 6. (Doc. Nos. 25, 26, 27, 27-1 through 27-26.) In its Reply Brief, the defendant argues that the Response and RSUMF were untimely and, therefore, that the SUMF should be deemed admitted for purposes of summary judgment. (Doc. No. 30 at 3 (citing L.R. 56.01(g)).) The Local Rules state that, "[i]f a timely response to a moving party's statement of material facts is not filed within the time periods provided by these rules, the asserted facts shall be deemed undisputed for purposes of summary judgment." L.R. 56.01(g). In the interest of justice, and in the absence of any showing of prejudice by the defendant, the court will permit the slightly late filings.

2

## II.    FACTS[4]

Both plaintiffs are "black African American individuals" who were employed in Hotel Indigo's housekeeping department. (RSUMF ¶¶ 2–3, 5, 61.) Both plaintiffs reported to Executive Housekeeper Karley Ross, who reported to General Manager Bill Bacelieri. (Doc. No. 27-6, Goggins Dep. 58:12–16; Doc. No. 27-7, Lacey Dep. 44:8–11, 45:18–22.) Ross is "Caucasian." (RSUMF ¶ 67.)

### A.    Lacey

Hotel Indigo hired plaintiff Marcus Lacey in April 2019 as a "houseman" in its housekeeping department. (*Id.* ¶ 61.) As a houseman, Lacey's job included "preparing rooms for housekeepers to clean, maintaining clean halls and stairwells, taking out trash and putting up stock," and performing other duties as assigned, including "helping in the laundry room." (*Id.* ¶¶ 62–63.) The parties dispute whether Lacey's "normal" job duties included sorting laundry, but it is undisputed that Lacey "was cross trained to assist in the laundry department to help as needed," and Lacey states that he "helped sort linen once or twice when he had time." (*Id.* ¶¶ 64, 73.) Hotel Indigo argues that it fired Lacey for insubordination and unprofessional interactions with coworkers. (Doc. No. 22-1 at 12 (describing Lacey's "admitted refusal and voiced discontentment with completing tasks assigned to him by management" as the basis for termination).)

In March 2021, Lacey had an argument with Ross, his supervisor, during which both were unprofessional and raised their voices and Ross used profanity, and for which only Ross was disciplined. (RSUMF ¶¶ 65–67.)[5] In June 2022, Hotel Indigo issued Lacey a written "Final

---

[4] Unless otherwise indicated, the facts set forth herein are undisputed and viewed in the light most favorable to the plaintiffs, as the non-moving party.

[5] Lacey disputes facts the court puts to the side, such as whether the argument was about sorting linen and whether Lacey also used profane language. (*See* RSUMF ¶ 65 ("The . . . incident did not involve sorting linen."); *id.* ¶ 67 (citing Doc. No. 27-7, Lacey Dep. 49:12–13 ("You asked

3

Warning" for referring to coworkers as "F***ing Lazy Mexican[s]" and refusing "to perform the assigned task of taking out the trash." (RSUMF ¶ 68 (first alteration in original).) Lacey disputes referring to his coworkers in this manner, but he does not dispute that he received a written warning for doing so or that he refused to take out the trash. (*Id.*) Lacey was instructed to complete his assigned tasks and to be professional, or else he would be terminated. (*Id.* ¶ 69; Doc. No. 22-16 at 2 ("Marcus must use professional behavior while at work and perform tasks assigned by his manager[.]").) For the following two months, Lacey "continued to have repeated disagreements with management about assigned tasks, including sorting linen." (RSUMF ¶ 70.)[6]

On August 26, 2022, Ross and Bacelieri "counseled" Lacey and gave him another written warning for "using unprofessional language and refusing to perform assigned job duties after he was instructed by his manager to assist with sorting laundry." (RSUMF ¶ 71 (citing Aug. 26, 2022 Written Warning, Doc. No. 22-17); *see also* Doc. No. 22-17 at 2 ("Marcus Screamed in Housekeeping office[, "]This place is Bullshit and I [ain't] fucking vacuuming or dusting[.] I

me if I cursed her. I said never in [sic] life.").) That Lacey and his supervisor had an "unprofessional verbal confrontation," for which only Ross was disciplined at the time, however, is undisputed.

[6] In support of this statement of fact, the defendant cites Lacey's deposition testimony. (SUMF ¶ 70 (citing Doc. No. 22-15, Lacey Dep. 112:17–22, 113:5–7).) Therein, Lacey recounts a two-month "situation with the linen," in which he was "asked repeatedly to sort the linen" but claimed that he "didn't have time to do it." (Doc. No. 22-15, Lacey Dep. 112:17–25.) In response to the defendant's statement of fact, Lacey writes, in full: "Undisputed that Lacey had repeated complaints about how he was mistreated because he was black." (RSUMF ¶ 70.) This response flouts both the Local Rules and the Federal Rules of Civil Procedure. *See* L.R. 56.01(e)(1) ("The response to the statement of undisputed material facts must contain . . . responses corresponding to each of the movant's numbered undisputed material facts by . . . disputing the fact on any basis permitted by Fed. R. Civ. P. 56(c)."); Fed. R. Civ. P. 56(c)(1) (requiring parties "asserting that a fact . . . is genuinely disputed" to "support the assertion" by either citing the record or "showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). The court treats the defendant's statement of fact as undisputed.

4

[ain't] doing this fucking job or anyone else's job[.]").)[7] Goggins signed the warning as a witness. (RSUMF ¶ 72.) The parties dispute whose job sorting laundry was, and Lacey contends that he was "being harassed about this because he was black, as he complained to Baciereli." (*Id.* ¶ 75.)

The next day, August 27, 2022, Hotel Indigo terminated Lacey's employment. (Lacey Separation Notice, Doc. No. 22-18 at 2.) According to the defendant, Lacey was terminated "after his refusal and voiced discontentment for completing tasks assigned to him by management." (SUMF ¶ 76.) Lacey's Separation Notice does not provide a reason for his termination. (Doc. No. 22-18 (listing as the only reason for separation: "Involuntary Sep[a]ration").)

During Lacey's employment, the plaintiffs maintain, he engaged in protected activity by reporting discrimination. In March 2021, after Ross swore at him but retained her position, Lacey told Bacelieri that, because in the past he had fired a black employee for swearing at a manager, his decision not to fire Ross for swearing at him "looks racially motivated on its face." (Doc. No. 27-7, Lacey Dep. 89:10–90:6.) And, on an unspecified date in August 2022, Lacey told Bacelieri that Ross' requiring him to sort laundry, when in fact laundry sorting was another, "non-black" employee's job, was racist, especially because the other employee was not disciplined for failing to complete assigned work. (Doc. No. 25 at 28 (citing Doc. No. 27-7, Lacey Dep. 72, 83, 113–14.)

## B. Goggins

Hotel Indigo General Manager Bill Bacelieri hired plaintiff Stephanie Goggins in July 2021 as Housekeeping Rooms Manager, a salaried management position in the housekeeping

---

[7] In support of this statement of fact, the defendant cites Lacey's second "Warning," as described above. In response to the defendant's statement of fact, Lacey writes, in full: "Undisputed that the document states that. Disputed for all other purposes." (RSUMF ¶ 71.) This response flouts the Local Rules. The court treats the proposed fact as undisputed. Moreover, Lacey concedes that he "used the word 'bulls**t when complaining about harassment he was receiving from Ross." (*Id.* ¶ 74 (alteration in original).)

department newly created for her after she declined his offer to be an hourly housekeeping supervisor. (RSUMF ¶¶ 5–9.) Goggins acted "as a liaison between housekeeping and the front desk, ensuring communication and smooth operations for things like VIP guests and special requests." (*Id.* ¶ 10.) Her "primary responsibilities . . . included inspecting and ensuring guest rooms were prepared for guest arrivals, overseeing training of employees, and delegating assignments to housekeepers." (*Id.* ¶ 11.) Throughout her tenure at Hotel Indigo, Goggins had repeated confrontations with management about her supposed poor performance and unprofessional interactions with coworkers—some allegations of which Goggins disputes. Bacelieri eventually decided to terminate her employment. (Doc. No. 22-6 at 3, Bacelieri Dep. 20:5–14.)

Early in her tenure, Hotel Indigo claims, Goggins began arriving late to work. (SUMF ¶¶13–14.) Goggins purports to dispute that she "exhibited issues with tardiness," but she concedes that she sometimes arrived late. (*Contrast* RSUMF ¶ 14 ("Goggins denies any issues with tardiness." (citation omitted)), *with id.* ¶ 13 ("Goggins admits to occasionally arriving late to work, but not habitually.").) Hotel Indigo states that, because of Goggins' tardiness, it moved her start time later, but that then she began leaving too early, such that she did not complete her day's work, causing "interpersonal issues" with her colleagues; and it meant that she worked only 35 hours per week. (SUMF ¶¶ 13–15, 21–22.) Goggins responds that, as a salaried employee, she "did not clock in or out," did not leave work early, and that she "left work when it was time for her to leave and any remaining work was to be performed by other employees." (RSUMF ¶¶ 15, 21–22.)

Hotel management was displeased with Goggins' performance. For example, the defendant states that Goggins did not promptly remove a sticker in an elevator after Bacelieri asked her to. Goggins responds that she contacted the maintenance department to remove the sticker. (*Id.* ¶¶ 25–

6

26.) Another dispute relates to the hotel's gym. Goggins was admonished for not inspecting the hotel's gym in early February 2022, despite many reminders, which led to guest complaints. (RSUMF ¶¶ 17–18.) Goggins acknowledges that she was reminded to inspect the gym and admonished for failing to do so, but she disputes the underlying accusation. (RSUMF ¶¶ 17–18, 20.)[8]

In addition, Hotel Indigo describes several incidents between Goggins and her colleagues. In May 2022, Hotel Indigo gave Goggins a written warning after it received multiple complaints that she acted unprofessionally toward her coworkers. (SUMF ¶¶ 23–24; *see also* Written Warning, Doc. No. 22-8 at 2 ("Stephanie was communicating to her coworkers in unprofessional way [sic].").) Goggins disputes the allegations and denies receiving a written warning,[9] but she concedes that she was warned about her communications with coworkers. (RSUMF ¶¶ 23–24.) Hotel Indigo issued Goggins another written warning for similar behavior in July 2022, "after [she had] been previously coached and counseled about written complaints from coworkers regarding her lack of teamwork and overall negative communications." (RSUMF ¶¶ 28–30.) Goggins denied the allegations at the time and refused to sign her written warning, though she noted on the form: "I understand Bill [Bacelieri] is giving me a 2nd [opportunity]." (RSUMF ¶¶ 28, 31; Doc. No. 22-11 at 2.).)[10] Hotel Indigo did not terminate her then but instead "gave Goggins a second opportunity

_____

[8] In her deposition, Goggins states that she does not remember whether she inspected the gym on the dates at issue but that she "always inspected the gym,," and therefore it was not possible that she failed to inspect it on two days in early February 2022. (Doc. No. 27-6, Goggins Dep. 68:14–69:18.)

[9] In the written warning, "Refused to Sign" is typed in place of Goggins' signature, and under "Employee Comments," the warning states, in relevant part, "Stephanie responded that her fellow employees are all Ghetto and need to go and she would not be signing anything." (Doc. No. 22-8 at 2.)

[10] The written warning form appears to indicate that Goggins was being terminated—it includes a section entitled "Reason for Termination"—while at the same time stating that, if she does not improve, she *will* be terminated. (Doc. No. 22-11 at 2.) The written warning also indicates

7

[and] continued to coach and counsel her in the hope that she would improve her job performance." (RSUMF ¶ 32.)

But, Hotel Indigo argues, Goggins' performance did not improve. Rather, Goggins repeatedly marked rooms as having been inspected when they had not been, leading guests, including a "VIP" guest, to check into dirty rooms, which embarrassed the defendant. On September 10, 2022, guests checked into dirty rooms after Goggins incorrectly marked them as having been cleaned. (SUMF ¶ 33.) Goggins states that she did not incorrectly mark rooms and guests did not check into dirty rooms. (RSUMF ¶ 33.) But Goggins concedes that Bacelieri reminded her of her duty to ensure that all rooms were inspected before leaving work.[11] On October 11, 2022, Hotel Indigo says, a VIP guest checked into a dirty room and called the front desk to complain, even though management had informed Goggins of the VIP's arrival and her duty to ensure a clean room. (SUMF ¶¶ 35–36.) Goggins disputes that she was informed of the VIP's arrival but concedes that a VIP guest complained about checking into a dirty room. (RSUMF ¶¶ 35–36.)[12] (*Id.* ¶ 34.) On October 12, Bacelieri reminded Goggins to ensure that VIP rooms had in fact been inspected before marking them as inspected. (*Id.* ¶ 37.) The defendant maintains that, after Goggins marked certain rooms as having been inspected, Bacelieri went to verify their cleanliness, at which point Goggins yelled "from three floors away about how he was not giving

---

that "Stephanie is also not following up on basic cleanliness issues in the hotel and contributing to a negative work environment." (*Id.*)

[11] Confusingly, Goggins denies that guests checked into dirty rooms or that she incorrectly marked any rooms as clean, while at the same time conceding that "Bacelieri counseled Goggins following the incident." (RSUMF ¶ 34 (disputing the proposed fact only insofar as "Goggins did not understand [Bacelieri's] comment to be 'counseling'").)

[12] Goggins states that she "cannot remember, but since her executive manager was also not aware of the VIP room, she does not believe she was told" about a VIP's impending stay. (RSUMF ¶ 35 (citing Doc. No. 27-6, Goggins Dep. 142:1–6.) Goggins concedes, however, that no guest should check into a dirty room. (Goggins Dep. 142:7–10.)

8

[her] a chance to do her job." (SUMF ¶¶ 38–39.) Upon checking the rooms, the defendant states, Bacelieri discovered that they had not been cleaned. (SUMF ¶ 40.) Goggins denies this account. She denies that Bacelieri inspected any of the at-issue rooms. (RSUMF ¶¶ 38, 40 (citing Doc. No. 28-1 at 98, Goggins Dep. 98:12–15).)[13] She both "denie[s] yelling" and "remembers this yelling accusation to be on a different day." (*Id.* ¶ 39.) After Bacelieri investigated the incidents of October 11 and 12, including by speaking with a "VIP guest [and] other witnesses, and reviewing hotel security footage," he found that Goggins left on both days without inspecting the rooms to ensure that they were cleaned. (*Id.* ¶ 41.) Goggins purports to dispute this fact, but she states only that the fact is disputed without offering any explanation or citation to the record to support her position. (*Id.* (stating, in full, "Disputed.")). It is therefore undisputed that Goggins failed to inspect rooms after specific instructions to do so. On October 21, 2022, following an investigation and consultation with Human Resources, Bacelieri terminated Goggins' employment for unsatisfactory job performance. (RSUMF ¶41 (citing Doc. No. 22-6, Bacelieri Dep. 97:1–98:35); *id.* ¶ 43; Doc. No. 22-14 at 2 (terminating Goggins' employment and indicating failure to inspect rooms as the reason for termination).)

Like Lacey, Goggins also reported discrimination to management during her employment. In June 2022, Goggins confronted Ross for deducting time spent on smoking breaks from Black employees but not White employees. (Doc. No. 27-6, Goggins Dep. 122:8–23; *see also* Doc. No. 25 at 5.) On a date Goggins cannot recall, she told Bacelieri that front desk employees "showed a lot of racial discrimination," including by calling her after hours. (*Id.* at 82:5–21.) On August 22,

---

[13] In support of her contention that Bacelieri did not inspect the at-issue rooms, Goggins cites only her own deposition. (RSUMF ¶ 40 (citing Doc. No. 27-6, Goggins' Dep. 98:12).) In her deposition, she is asked: "Do you know whether Bill went to check those rooms before the VIPs were checked in? A. No, I don't know, but I don't believe he did." (Goggins Dep. 98:10–12.)

2022, Goggins says, she reported to Bacelieri that she believed White employees were making false reports about her job performance. (*Id.* at 186:7–21; *see also* Doc. No. 25 at 8.)

## III. LEGAL STANDARDS

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Bilyeu v. UT-Battelle, LLC*, 154 F.4th 396, 402 (6th Cir. 2025). But the defendant is not entitled to judgment "if there is evidence in the record 'on which the jury could reasonably find for the plaintiff.'" *Huang v. Ohio State Univ.*, 116 F.4th 541, 555 (6th Cir. 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Anderson*, 477 U.S. at 248.

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A). Then the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018) (quoting *Anderson*, 477 U.S. at 250). Credibility judgments and the weighing of evidence are improper. *Huang*, 116 F.4th at 555 (citing *Anderson*, 477 U.S. at 255).

10

## IV.    DISCUSSION

### A.    Lacey's Title VII claims

The court will dismiss Lacey's Title VII claims as untimely. Before filing suit in federal court, a Title VII plaintiff must first exhaust his administrative remedies by filing a charge of discrimination with the EEOC and receiving a right-to-sue letter. *Alexander v. Univ. of Memphis*, No. 20-5426, 2021 WL 2579973, at *3 (6th Cir. June 7, 2021) (citing *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018)). Both plaintiffs satisfied this requirement. (RSUMF ¶¶ 94–97.) Next, a plaintiff must file suit within 90 days of receiving the right-to-sue letter. *Jackson v. Trinity Health Michigan*, No. 23-2099, 2024 WL 5245014, at *2 (6th Cir. Sept. 4, 2024) (citing 42 U.S.C. § 2000e-5(f)(1)). Courts presume that a plaintiff has received the letter five days after the EEOC issued it unless the plaintiff rebuts this presumption. *Id.* (citing *Graham-Humphreys v. Memphis Brooks Museum of Art Inc.*, 209 F.3d 552, 557–58 (6th Cir. 2000)).

In this case, the EEOC issued Lacey's right-to-sue letter on December 13, 2023, and Lacey received the letter that same day "via his attorney." (RSUMF ¶¶ 97–98.) Even if the court affords Lacey the presumptive five-day period for receipt of the letter, ninety-five days after December 13, 2023 was Sunday, March, 17, 2024, so his deadline to sue was Monday, March 18, 2024. Fed. R. Civ. P. 6(a)(1)(C). The plaintiffs filed this case on March 19, 2024. (Doc. No. 1.)

While the deadline to file is not jurisdictional, "it is a mandatory claims-processing rule that must be enforced if properly raised by the employer." *Jackson v. Trinity Health Mich.*, No. 23-2099, 2024 WL 5245014, at *2 (6th Cir. Sept. 4, 2024). Courts "ordinarily may not extend it even by 'a single day.'" *Rembisz v. Lew*, 830 F.3d 681, 683 (6th Cir. 2016) (quoting *Graham-Humphreys*, 209 F.3d at 557). The defendant has properly raised this argument, (Doc. No. 22-1 at 27–28), and Lacey offers no response. Accordingly, Lacey's claims of discrimination and retaliation under Title VII will be dismissed. However, Lacey's Section 1981 claims are not subject

to an exhaustion requirement and therefore are not time-barred. *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 n. 3 (6th Cir. 2011). Goggins received a right-to-sue letter on December 20, 2023, (RSUMF ¶ 95), so her Title VII claims are not time-barred.

### B. Discrimination

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). Employment discrimination is also prohibited by Section 1981, which states in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Courts evaluate race discrimination claims under Title VII and Section 1981 under the same standards. *Johnson v. Bender Mgmt., LLC*, No. 25-1374, 2025 WL 2742524, at *2 (6th Cir. Sept. 26, 2025) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)). Accordingly, the court will conduct a single analysis for the plaintiffs' discrimination claims.

To prove race discrimination under Title VII, the plaintiff must offer evidence that the defendant took adverse action against her and that race was a motivating factor. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). These elements may be established by direct or circumstantial evidence. *Johnston v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003). The plaintiffs proceed only on circumstantial evidence (Doc. No. 25 at 12), so the court analyzes plaintiffs' discrimination claims under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, at 803–805 (1973). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Once she does, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. And if the defendant meets this burden, "the burden shifts back

12

to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016).

### 1. *Prima face case*

To make out a *prima facie* discrimination case, the plaintiff must show that: (1) she is a member of a protected class, (2) was qualified for his job, (3) suffered an adverse employment decision, and (4) "was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019). The defendant argues only that neither plaintiff can make out the last requirement. (Doc. No. 22-1 at 17–22; Doc. No. 30 at 2–3.) The plaintiffs do not argue that they were replaced,[14] but rather that they were treated worse than similarly situated non-protected employees, which is therefore the sole issue on which the plaintiffs' *prima facie* argument turns. (Doc. No. 25 at 21–26.)

To show that another employee is "similarly situated," a plaintiff need not demonstrate an "exact correlation" but instead must demonstrate that he and the other employee are similar in "all of the relevant aspects." *Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. P'ship*, 508 F. App'x 404, 411 (6th Cir. 2012) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (internal quotation marks and emphasis omitted).

As the Sixth Circuit has recently reiterated, as relevant here:

---

[14] It is undisputed that no one was hired to fill Goggins' position—a role created especially for her—and that her responsibilities were reassigned to existing employes after her termination. (RSUMF ¶ 44.) *Accord Warren v. Hollingsworth Mgmt. Servs., LLC*, No. 22-1064, 2022 WL 18542504, at *3 (6th Cir. Dec. 19, 2022) ("A 'person is not replaced when . . . the work is redistributed among other existing employees already performing related work.'" (quoting *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)). No party states that Lacey was replaced.

In the disciplinary context, "to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Echols v. Ky. Just. & Pub. Safety Cabinet*, No. 24-5715, 2025 WL 896922, at *2 (6th Cir. Mar. 24, 2025) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

The plaintiffs argue that Karley Ross, Hotel Indigo's Executive Housekeeper and both plaintiffs' direct supervisor, is the relevant comparator for them both: "[l]ike Goggins and Lacey, Ross was subject to the same rules as an employee[] and [was] supervised by Bacelieri. However, Ross was treated better when committing worse and similar policy violations." (Doc. No. 25 at 22.) It is undisputed that Ross is Caucasian (RSUMF ¶ 67) and therefore non-protected for purposes of a race discrimination comparator. The defendant responds that Lacey is not similarly situated to Ross because they had drastically different roles and that, even if Goggins is similarly situated to Ross, she was not treated less favorably for a prohibited reason. (Doc. No. 30 at 2–3.)

Ross was Hotel Indigo's Executive Housekeeper, in which capacity she was supervisor to both plaintiffs. (RSUMF ¶ 65 (Lacey); Doc. No. 27-6, Goggins Dep. 58:12–13 ("Q. Was Karley your immediate supervisor? A. Yes.").) Courts are skeptical that supervisors can be comparators.[15] Putting that aside—in part because of the apparently fluid job responsibilities within the Housekeeping Department, as the court will discuss—the court examines whether Ross was similarly situated to each plaintiff before discussing whether she was treated more favorably.

---

[15] *See, e.g.*, *Mzozoyana v. McDonough*, No. 3:19-CV-091, 2022 WL 16856708, at *7 (S.D. Ohio Nov. 10, 2022) ("Because he was her supervisor, this Court seriously doubts that McGahey was similarly situated to Meka."); *Bracy v. Consumers Energy Co.*, No. 2:20-CV-10969, 2021 WL 735786, at *2 (E.D. Mich. Feb. 25, 2021) ("Borowiak, as plaintiff's supervisor, is not similarly situated to plaintiff." (first citing *Curtis v. Earnest Mach. Prod. Co.*, 2012 WL 5879439, at *1 (S.D. Ind. Nov. 20, 2012); and then citing *Henry v. Delta Air Lines, Inc.*, 2011 WL 3444089, at *9 (E.D. Ky. Aug. 8, 2011))).

14

While it may appear that Ross and the plaintiffs did not "deal[] with the same supervisor" because Ross was the plaintiffs' supervisor, "[r]equiring comparators to have the 'same supervisor' may be better understood as requiring comparators to have 'dealt with the same ultimate decision-maker.'" *Zandvakili v. Univ. of Cincinnati*, No. 23-3396, 2024 WL 278548, 2024 U.S. App. LEXIS 1832 at *19 (6th Cir. 2024) (*quoting Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255, n. 3 (6th Cir. 2023)). In this case, the ultimate decision-maker for all three was Bacelieri.

However, the plaintiffs' statement that "Ross was subject to the same rules as an employee" does not advance their argument that she is similar to the plaintiffs in all relevant respects. By that logic, any two employees at a company would be similarly situated. By way of example, the Sixth Circuit has stated that "supervisory and non-supervisory employees [are] not . . . similarly situated." *Rutherford v. Britthaven, Inc.*, 452 F. App'x 667, 672 (6th Cir. 2011) (citing *Quinn–Hunt v. Bennett Enters., Inc.*, 211 F. App'x 452, 459 (6th Cir. 2006)). And "employees with different job responsibilities may not be similarly situated." *Id.* (citing *Russell v. Ohio, Dep't of Admin. Servs.*, 302 F. App'x 386, 391 (6th Cir. 2008)); *see also McEwen v. Am. Airlines Grp., Inc.*, No. 1:17 CV 100, 2017 WL 1155514, at *2 (N.D. Ohio Mar. 27, 2017) ("[T]wo employees with different job titles and responsibilities are not similarly situated." (collecting cases)). And, as discussed above, to be similarly situated, two employees must have engaged in the same conduct without differentiating circumstances that would license different treatment. *Echols*, 2025 WL 896922, at *2.

The parties do not discuss at length Ross' job responsibilities as Executive Housekeeper. But a February 2024 "Action Plan" from Bacelieri to Ross explains many of her duties. Among Ross' responsibilities were "implementing and overseeing enhanced room cleanliness protocols," which involved training housekeeping staff; organizing and leading twice-daily "huddle meetings

15

with the housekeeping and public area teams"; meeting thrice-monthly with other department managers to "ensure alignment and collaboration"; enforcing the hotel's staff dress code; managing housekeeping's budget, including "planning and execution in ordering supplies and scheduling staff to ensure operational efficiency and cost-effectiveness"; and tracking housekeeping activities on the hotel's system. (Doc. No. 27-21 at 2–4.)

On these facts, Ross was not similarly situated to Lacey because Ross was far senior to Lacey and had much different job responsibilities. Ross' responsibilities appear to have overlapped with Goggins', although the plaintiffs equivocate on this point. First, the plaintiffs state that, while Goggins had a "Manager" title and was paid a salary, "she was viewed and treated as Ross's assistant."[16] (Doc. No. 25 at 22; *see also id.* ("Ross understood that Goggins would be a helping hand[.]").) But in the same paragraph, the plaintiffs state that Goggins' responsibilities overlapped with Ross'. (*Id.* ("There was significant overlap in responsibilities . . . . All were involved in

---

[16] In support of this statement, the plaintiffs purport to cite Ross' deposition testimony. In fact, the plaintiffs' Response brief cites the deposition of Karley Ross many times, once specifying where in the record it ought to exist. (Doc. No. 25 at 2 (citing "Exhibit 6: Karley Ross Deposition 66"); *see also* Plaintiff's [sic] Evidentiary Submission ("Exhibit List"), Doc. No. 27 at 1 (listing Ross's deposition as "Exhibit 6").) However, the sixth exhibit the plaintiff filed contemporaneously with the Exhibit List—the plaintiffs' exhibits themselves are not numbered— is in fact Goggins' deposition (Doc. No. 27-6). The Exhibit List marks Goggins' deposition as Exhibit 8, while Exhibit 8 is in fact a Record of Verbal Discussion. (Doc. No. 27-8). But the plaintiffs have *not* filed the transcript of Karley Ross' deposition. And, while the defendant has filed excerpts of it (Doc. No. 22-9), the court has identified only one citation of the plaintiffs' that corresponds to the excerpts that the defendant submitted. (Doc. No. 25 at 2 (citing Ross. Dep. 90 for propositions regarding other employees' race); *see* Doc. No. 22-9, Ross Dep. 90:2–4, 10–14.) In addition, the Exhibit List marks Lacey's Deposition as Exhibit 9, while the ninth exhibit filed is an email correspondence. (Doc. No. 27-9.) In fact, the plaintiffs filed Lacey's Deposition as the seventh Exhibit (Doc. No. 27-7), which the Exhibit List marks as Bill Bacelieri's Deposition. (Doc. No. 27 at 1.) But the plaintiffs have not filed the Deposition of Bill Bacelieri. In addition, the plaintiffs' subsequently filed Notice of Filing (Doc. No. 28) gives notice that the plaintiffs contemporaneously filed "two additional filings": "Exhibit 8," Lacey's Deposition (Doc. No. 28-1), and "Exhibit 9," Goggins' Deposition (Doc. No. 28-2), both of which, as the court mentioned, were already in the record.

making boards, inspecting rooms and cleaning rooms."); *see also id.* (noting that Ross and Goggins "perform[ed] many of the same tasks," including "issu[ing] disciplines"); *id.* ("While Ross held the title of executive housekeeper with final decision-making authority, Goggins' role was a supervisor or assistant manager that required her to perform many of the same tasks.").) The court finds that a reasonable jury could find Ross and Goggins similarly situated with respect to their job duties, even if they differed in some respects, and even though Ross was Goggins' superior.

The court next addresses whether Goggins was treated less favorably than Ross for engaging in similar conduct, without differentiating circumstances. The defendant argues that "both Goggins and Ross were counseled . . . regarding their job performance[s], each received repeated written warnings regarding their performance[s], and both were ultimately terminated." (Doc. No. 30 at 3 (citations omitted).) The plaintiffs posit two examples of how "Ross was treated better when committing worse and similar policy violations." (Doc. No. 25 at 22.) First, the plaintiffs argue, Ross engaged in more serious misconduct than Goggins which, for Ross, resulted in a series of initial informal warnings, one-on-one meetings, and written action plans before she was issued any formal warnings, while Goggins did not receive such lax treatment. (*Id.* at 23 ("Bacelieri permit[ted] Ross's extensive performance deficiencies before resorting to issuing written warnings.").) Second, the plaintiffs argue, unlike Goggins, "Ross was given the opportunity to resign, instead of being fired." (*Id.* at 24.)

The plaintiffs have not shown that Ross and Goggins "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Goodwin v. Newcomb Oil Co.*, No. 23-5594, 2024 WL 1828304, at *4 (6th Cir. Apr. 26, 2024) (quoting *Ercegovich*, 154 F.3d at 352). To make this showing, the plaintiffs must simply show that Ross and Goggins "engaged in acts of 'comparable

seriousness,' but not necessarily identical conduct." *Id.* (quoting *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016)).

The plaintiffs mention Ross' use of profanity during a 2021 argument with Lacey, as the court has recounted, for which she received a written "Verbal Warning/Counseling" (Doc. No. 27-19). (Doc. No. 25 at 22–23.) And the plaintiffs describe an unnamed manager's comments on an undated "Leadership Performance Review – Worksheet,"[17] noting "repeated coaching throughout 2023 on critical action items like room inspections, staff productivity, and maintaining professional standards of behavior and appearance." (Doc. No. 25 at 23 (quoting Doc. No. 27-20 at 2).) In addition to the coaching Ross received, the plaintiffs argue, she also received an Action Plan (Doc. No. 27-21 (dated February 1, 2024)) and "one-on-one meetings" (Doc. No. 27-23 (describing meetings between Karley and one or more unnamed persons on various topics during Spring 2024)) that "document[ed] persistent performance issues," all *before* Ross was issued written warnings. (Doc. No. 25 at 23–24.) By comparison, the plaintiffs argue, Goggins was not afforded similar grace.[18] (*Id.*)

The evidence shows, however, that one or more unnamed managers alternately praised Ross, suggested areas for improvement, and found other areas unsatisfactory. For example, the Leadership Performance Review notes that Ross "demonstrates commendable empathy and

---

[17] Because the document repeatedly references 2023 and goals for 2024, the court infers that it was likely prepared at the end of 2023. (*See* Doc. No. 27-20 at 2 ("In 2024, Karl[e]y's focus on professional growth . . . will be instrumental in evaluating her department's performance.").) The document in the record omits text presumably included in its digital version. For example, multiple entries under "Manager Comments" are cut off mid-sentence or, for a given line of text, only its top half has been printed. (*See, e.g., id.* at 2 ("The root of these challenges seems to be a combination of [sic.]").)

[18] However, the plaintiffs explicitly concede that both Ross and Goggins received at least some informal warnings. (Doc. No. 25 at 23 ("Both Goggins and Ross received a verbal counseling for 'violations of company policies and/or procedures.'").)

18

compassion" and that she "often go[es] above and beyond to assist during challenging times," but that she "shows a tendency to avoid difficult conversations," which leads to her score of 2 out of 4 for the "guiding principle" of "lead with heart." (Doc. No. 27-20 at 1.) On the guiding principle of "aim higher," Ross also received a 2 because, while she sets goals, she needed "specific direction and frequent redirection," including, for example, on addressing problems with "the timing of room inspection entries and the lack of associate coaching," which caused Hotel Indigo to score "below the brand average for 2023." (*Id.*) The form states that Ross also needed to improve in the areas of "formal communication processes," inventory management and scheduling, "maintaining professional standards of behavior and appearance," and "team management and conflict resolution." (*Id.* at 1–2.) A document that appears to summarize one-on-one meetings with Ross and unnamed others notes issues with unclean rooms, conducting daily team meetings, abiding by and enforcing the hotel's employee dress code, and budgeting. (*See generally* Doc. No. 27-23.)

The plaintiff makes a related argument that both Ross and Goggins received merely "verbal counseling" for misconduct of varying seriousness: Goggins was counseled for not inspecting the gym, while Ross was counselled for swearing at Lacey. (Doc. No. 25 at 25 (citations omitted).) The plaintiffs argue that "[a] reasonable juror could conclude a white woman calling an older man a lying sack of shit and telling him to go the eff [sic] home is a more serious violation than Goggins's purported failure to check the fitness room." (*Id.*) The plaintiffs may be right, but they misapply the relevant standard and misunderstand what gives rise to an inference of discrimination: it is the disparate treatment of similarly serious behavior, not the similar treatment of disparate behavior. See *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (noting that

the comparator must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (quoting *Mitchell*, 964 F.2d at 583). Informal warnings, as distinct from written warnings, may well be appropriate for a range of infractions, and the plaintiff has cited no evidence that Ross' discipline for using profane language was too light a punishment.

The plaintiffs' second argument is that "Ross was given the opportunity to resign, instead of being fired." (Doc. No. 25 at 24.) Goggins received at least two written warnings—one of which is styled as a termination notice—*both* of which gave warning that any further misconduct would result in termination. (*See* May 17, 2022 "Written," Doc. No. 22-8 at 2 (noting the "reason for warning" as unprofessional communication with coworkers and specifying that "[a]ny further unprofessional behavior in [regards] to communication or job duties will result in immediate separation of employment"); July 22, 2022 "Written," Doc. No. 22-11 at 2 (referring to the "reason for termination" as repeated coaching and counseling on "negative communication" with coworkers, noting the May 17 warning, and including Goggins' notation that "Bill [Bacelieri] is giving me a 2nd [opportunity]").) Then, on October 12, 2022, Bacelieri admonished Goggins in person for her missed VIP room inspections on consecutive days. (RSUMF ¶ 37; *see also* Doc. No. 22-13 at 2 (Bacelieri's contemporaneous report of his conversation with Goggins, in which he informed Goggins that "the reason I was up double checking [the rooms] is because we had a major complaint <u>yesterday for the same thing you're doing today . . . not inspecting rooms</u>'" (emphasis and omission in the original)).) Bacelieri then fired Goggins nine days later, after conducting an investigation confirming his earlier admonishment. From the record, Goggins had ample opportunity to resign before being terminated.

20

Ross also received two written "Warnings." On April 10, 2024, Ross received a "First Warning" for "failure to maintain accurate inventory records" and for budget and inventory mismanagement.[19] (Doc. No. 27-22 at 1.) On May 31, 2024, Ross received a "Final Warning,"[20] for failing to inspect VIP rooms and lying about it. (Doc. No. 27-24 at 1 (noting that "[t]his lack of integrity is not an isolated incident").) Ross resigned ten days after receiving the Final Warning. In her June 10, 2024 resignation email, Ross wrote, in relevant part, "given that Human Resources has decided that my recent actions of self-defense are to be classified as an act of violence[,] I have no choice but to tender this resignation." (Doc. No. 27-25.) The parties provide little context for this incongruous resignation email. The plaintiffs state only that "Ross was in a physical [sic] with [an] African American housekeeper." (Doc. No. 25 at 24 (purporting to cite Ross' deposition, "Exhibit 6").[21])

The court finds that neither plaintiff has made out a *prima facie* case of discrimination. Out of an abundance of caution, the court nevertheless proceeds under the burden-shifting framework.

### 2.    *Proffered reason*

Hotel Indigo has described performance and interpersonal issues which led to the plaintiffs' terminations. Moreover, the plaintiffs appear to concede that the defendant has met its burden of production. (*See* Doc. No. 25 at 19 ("This is circumstantial evidence sufficient to find that *Defendant's stated, legitimate, non-discriminatory reason for discipline and termination* is

---

[19] Specifically, Ross was warned for buying $1,800 of unneeded vacuums and at the same time failing to buy $2,000 of linen. (Doc. No. 27-22 at 1.)

[20] The form Ross received indicates that employees receive a first, second, and final warning, but there is no "Second Warning" in the record for Ross. By comparison, Goggins' Warning forms do not include a template indicating which warning they were.

[21] As the court has explained, Ross' deposition transcript is not in the record.

21

unworthy of credence.") (emphasis added).) The defendant has therefore shifted the burden back to the plaintiffs.

### 3.    Pretext

To survive summary judgment, the plaintiffs most produce "sufficient evidence from which a jury could reasonably reject" Hotel Indigo's proffered reason for firing them. *Goodwin*, 2024 WL 1828304, at *6 (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020)). Moreover, the plaintiff must show "*both* that the employer's proffered reason was not the real reason for its action, *and* that the [defendants'] real reason was unlawful." *Amaefuna v. Gamsby*, No. 24-5289, 2024 WL 5505918, at *2 (6th Cir. Dec. 19, 2024) (alterations and emphasis in original) (quoting *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (*en banc*)). While there is no prescribed way to show pretext, "plaintiffs typically show pretext in one of three ways: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action.'" *Miles*, 946 F.3d at 888 (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). But "these three categories are simply a 'convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?'" *Miles*, 946 F.3d at 888 (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)) (internal quotation marks omitted). The plaintiffs do not make their pretextual argument explicit.[22]

---

[22] By way of illustration, the plaintiffs' "Argument" section contains nine sub-sections, one of which is entitled "Plaintiffs can establish a *prima facie* case of race discrimination." (Doc. No. 25 at 20–24.) By comparison, none of the other subsections includes "pretext" in its title, and the entire Argument section contains the word "pretext" only three times. (*See id.* at 26 ("The absence of contemporaneous documentation of numerous complaints of unprofessionalism can be considered circumstantial evidence of *pretext*. *Pretext* can be considered circumstantial evidence of discrimination." (emphasis added)); *id.* at 29 ("These are the types of falsities, contradictions, and inconsistencies that serve as circumstantial evidence of a *pretext* that can support an inference

For a plaintiff to show that the proffered reason had no basis in fact, he needs to "provide evidence that the employer's allegations never happened." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021). Put another way: "[t]he relevant question, at its core, is whether [the defendant] 'made up its stated reason to conceal intentional discrimination.'" *Shears v. FirstEnergy Corp.*, No. 24-3915, 2026 WL 27555, at *5 (6th Cir. Jan. 5, 2026) (quoting *Pelcha*, 988 F.3d at 326–27). The defendant contends that it terminated the plaintiffs for unsatisfactory performance and insubordination. (Doc. No. 22-1 at 5.) As the court has discussed above, while the plaintiffs dispute some of the defendant's characterizations of their workplace conduct, they have conceded—either expressly or through failing to properly respond to the SUMF—various misconduct, such that they cannot prevail on an argument that the proffered reasons for their terminations had no basis in fact. For example, Lacey concedes that he did not fold linen when ordered to do so and that he had an unprofessional confrontation with his manager. And it is undisputed that Goggins did not inspect VIP rooms after being told to and that she received multiple warnings for misconduct. The plaintiffs do not make explicit an argument that the

---

of a discriminatory and retaliatory motive." (emphasis added)).) While failure to use the word "pretext" is not fatal, it is indicative of the plaintiffs' inscrutable argument. In contrast, the plaintiffs cogently discuss how to show pretext in the Response's "Legal Standards" section. This is because the plaintiffs have copied over a dozen paragraphs from three of this court's opinions without using quotation marks or even citing two of the three cases they borrow from. *See* Doc. No. 25 at 11–18 (first copying *Jordan v. Mathews Nissan, Inc.*, 539 F. Supp. 3d 848, 864, 866, 891–93, (M.D. Tenn. 2021) (Richardson, J.); then copying *McKibbens v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:17-CV-01110, 2018 WL 6696990, at *3–4, 7–8 (M.D. Tenn. Dec. 20, 2018) (Richardson, J.); and then copying *Kostic v. United Parcel Serv., Inc.*, 532 F. Supp. 3d 513, 530–531 (M.D. Tenn. 2021) (Richardson, J.)). While litigants need not reinvent the wheel when it comes to legal standards, "citation to authority is absolutely required when language is borrowed." *United States v. Bowen*, 194 F. App'x 393, 402 n.3 (6th Cir. 2006).

defendant's decision had no basis in fact, but construing the plaintiffs' Response brief to include such an argument, no reasonable jury could find that this argument establishes pretext.

b) *Proffered Reason was not the real reason*

Another way plaintiffs can show pretext is by providing evidence that the defendant's proffered reason for termination "did not actually motivate the discipline[.]" *McNeal v. City of Blue Ash*, 117 F.4th 887, 896 (6th Cir. 2024). That is, plaintiffs can "attack[] the employer's explanation by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant." *Hartman v. Dow Chem. Co.*, 657 F. App'x 448, 453 (6th Cir. 2016) (emphasis in original and internal quotation marks omitted) (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000)). One way plaintiffs can show this is by adducing evidence that an employer provided "shifting terminations rationales." *See Miles*, 946 F.3d at 890 (citations omitted). As the Sixth Circuit has explained:

> Shifting justifications over time call[] the credibility of those justifications into question. By showing that the defendants' justification for firing him changed over time, [the plaintiff] shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination.

*Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 540 (6th Cir. 2014) (quoting *Cicero v. Borg–Warner Auto., Inc.,* 280 F.3d 579, 592 (6th Cir. 2002)). The plaintiffs allude to this argument by recounting what they describe as "falsehoods, contradictions, and inconsistencies" in statements made by Bacelieri and Ross, noting that they constitute "circumstantial evidence sufficient to find that Defendant's stated legitimate, non-discriminatory reason for discipline and termination is unworthy of credence." (Doc. No. 25 at 20.)[23] Relevant here, the plaintiffs state that, while

---

[23] Some of the allegedly false statements concern the discrepancy between, on the one hand, Hotel Indigo's denial, in its response to the EEOC, that the plaintiffs made reports of race-based discrimination, and Bacelieri's and Ross's statements, on the other hand, acknowledging

Bacelieri stated that Ross and another employee, Shaleeta McAdoo, denied "involve[ment] in drug deals" and accused Goggins of "using marijuana and edibles," Ross denied thinking Goggins was selling or taking illegal drugs and denied hearing McAdoo saying anything of the sort. (Doc. No. 25 at 19–20 (first citing "Exhibit 7: 178–80"; and then citing "Exhibit 6: 133, 157").) Even if the court were to accept the plaintiffs' account,[24] the plaintiffs do not argue, and the record contains no evidence, that drug use or sales were actual or alleged bases for any discipline. The plaintiffs' statement that the supposed inconsistencies are "significant because Bacelieri and Ross were involved in the circumstances leading to the disciplines and terminations of both Plaintiffs," without further explanation or context, does not advance their argument. (Doc. No. 25 at 20.)

         c)      *Proffered reason was insufficient to motivate the employer's action*

A third way plaintiffs can establish pretext is by showing that the employer's proffered reasons were "'insufficient to motivate' the firing." *Porter v. Jackson Twp. Highway Dep't*, No. 24-3524, 2025 WL 1742934, at *4 (6th Cir. June 24, 2025) (quoting *Chen*, 580 F.3d at 400). To make this argument, plaintiffs "usually . . . present[] evidence that other employees, particularly

---

that they did. (Doc. No. 25 at 18–19.) But this alleged discrepancy does not involve shifting explanations for the plaintiffs' terminations.

   [24] As the court has described, it is difficult to determine what sources the plaintiffs means to cite because the Exhibits themselves are not numbered and the Exhibit List's numbering does not match the order in which the plaintiffs electronically filed the Exhibits. In this instance, the plaintiffs describe a statement Bacelieri made. (Doc. No. 25 at 19 (citing Exhibit 7).) On the plaintiffs' Exhibit List, "Exhibit 7" is described as "Bill Bacelieri Deposition (pending redaction)." (Doc. No. 27 at 1.) The seventh document the plaintiff filed with its Exhibit List is the Deposition of Marcus Lacey. (Doc. No. 27-7.) But as the court has described, the plaintiffs have not filed Bacelieri's deposition transcript. And while the defendant has filed excerpts of Bacelieri's deposition, it has not filed the pages the plaintiff cites. (*See* Doc. No. 22-6 at 46–47 (skipping from Deposition page 155 to 189).) Meanwhile, the plaintiffs cite "Exhibit 6" for a statement Ross made. (Doc. No. 25 at 20.) The Exhibit List indicates that "Exhibit 6" is "Karley Ross Deposition-redacted." (Doc. No. 27 at 1.) As the court has already explained, the plaintiffs have not filed Ross' deposition transcript. And, while the defendant has filed excerpts, they do not include the pages the plaintiffs cite. (*See* Doc. No. 22-9 at 9–10 (skipping from Deposition page 120 to 173).)

25

outside the protected class, were not disciplined although they engaged in 'substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff.'" *McNeal*, 117 F.4th at 896 (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)).

The court has already concluded, at the *prima facie* stage, that neither plaintiff has identified a comparator treated more favorably than they were. In any case, as the court described at length, the plaintiffs have not presented evidence that Ross was not disciplined. The plaintiffs' argument that Ross received more informal warnings than Goggins was unavailing at the *prima facie* stage, and it is similarly unavailing at the pretext stage. And the same for their argument that Ross was permitted to resign and Goggins was not.

The plaintiffs have not presented evidence from which a reasonable jury could conclude that the defendant's stated reasons for terminating them were pretext for a discriminatory motive. Accordingly, the plaintiffs' remaining discrimination claims will be dismissed.

### C.     Retaliation

Title VII prohibits retaliation against employees for engaging in protected conduct, including "complaining to anyone . . . about allegedly unlawful practices." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344–55 (6th Cir. 2021) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)); *see also Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014) (citing 42 U.S.C. § 2000e–3(a)). "The elements of a retaliation claim under § 1981 are the same as those under Title VII," *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019), and courts review Title VII and Section 1981 retaliation claims under the same standards. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009). Thus, as with this court's analysis of the plaintiffs' discrimination claims, the court can conduct a single analysis of the plaintiffs' retaliation claims.

A plaintiff can prove a retaliation claim by presenting "either direct or circumstantial evidence of a retaliatory motive." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x. 394, 397–98 (6th Cir. 2015). When a plaintiff relies on indirect evidence, as here, the claim proceeds under the *McDonnell Douglas* burden-shifting framework. *Id.* at 398. Under this framework, a plaintiff must first submit evidence from which a reasonable jury could conclude that he has established a *prima facie* case of retaliation. If the plaintiff can establish his *prima facie* case, the burden shifts to the employer to provide a "legitimate, nondiscriminatory reason for its actions." *Lee v. Dana, Inc.*, No. 24-1964, 2025 WL 1684347, at *3 (6th Cir. June 16, 2025) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)). If the employer does so, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the proffered reasons by the employer were a pretext for retaliation." *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 528 (6th Cir. 2020) (citing *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015)).

### 1. Prima facie case

To make out a *prima facie* case of retaliation, a plaintiff must point to evidence that: (1) she engaged in protected activity; (2) the employer knew she engaged in protected activity; (3) an adverse employment action was subsequently taken against her; and (4) "there was a causal connection between the protected activity and the adverse employment action." *Lee*, 2025 WL 1684347, at *3 (quoting *Niswander*, 529 F.3d at 720). Hotel Indigo argues only that the plaintiffs cannot satisfy the fourth element. (Doc. No. 22-1 at 26–27.) "Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Shivers v. Charter Commc'ns, Inc.*, No. 22-

3574, 2023 WL 3244781, at *10 (6th Cir. May 4, 2023) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

The plaintiffs state that Hotel Indigo retaliated against them several times, in addition to firing them, by issuing written warnings. (*See, e.g.*, Doc. No. 25 at 6 ("Lacey suffers [an] adverse employment action" in the form of a "written final warning"); *id.* at 24 (describing a "verbal coaching and counseling discussion" Goggins received as an "adverse employment action"; *id.* at 27 (describing "discriminatory and retaliatory adverse employment action by issuing Goggins a written warning").

Discrimination and retaliation claims require different showings. Unlike Title VII discrimination claims, the "adverse employment action" requirement for retaliation claims "is not limited to an employer's actions that affect the terms, conditions, or status of employment." *Maas v. JTM Provisions Co.*, No. 1:23-cv-00076-JPH, 2025 WL 823671, at *12 (S.D. Ohio Mar. 13, 2025) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–63 (2006)). Rather, "the plaintiff must show that he faced an adverse action that is 'harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Bilyeu*, 154 F.4th at 405 (quoting *Burlington N.*, 548 U.S. at 68). But "de minimis employment actions are not materially adverse for purposes of either claim." *Ali v. City of Cleveland*, No. 1:23-CV-00157, 2025 WL 2653592, at *7 (N.D. Ohio Sept. 16, 2025) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000)). In this case, the warnings the plaintiffs received do not suffice as adverse employment actions.[25]

---

[25] *Accord, e.g.*, *Su v. Tosh Pork, LLC*, No. 1:24-CV-01038-STA-JAY, 2024 WL 2216858, at *7 (W.D. Tenn. May 16, 2024) ("A write-up alone, without an accompanying reduction in pay, benefits, or some other adverse effect, is not sufficient to constitute an adverse employment action." (citations omitted)); *Williams v. McDonough*, No. 3:17-CV-00273-RGJ, 2022 WL 16855793, at *8 (W.D. Ky. Nov. 10, 2022) ("Even meetings at which an employer threatens

However, the plaintiffs engaged in protected activity "very close in time" to their terminations, which can show causation at the *prima facie* stage. *Brown v. FCA US LLC*, No. 25-1405, 2025 WL 3657226, at *6 (6th Cir. Dec. 17, 2025) (quoting *Lindsay v. Yates*, 578 F.3d 407, 418-19 (6th Cir. 2009)); *accord McCormick v. Gasper*, No. 22-1033, 2022 WL 16586621, at *10 (6th Cir. Nov. 1, 2022) ("The causal connection element is satisfied 'only where the adverse employment action occurred within a matter of months, or less, of the protected activity.'" (quoting *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007))). In August 2022, Lacey was fired after complaining earlier that month that his being required to fold laundry was racially motivated. Goggins reported to Bacelieri in August 2022 that her White colleagues were making false reports about her because of her race, and she was fired in October 2022. The defendant ignores Lacey's 2022 complaint in its argument regarding causation. (*See* Doc. No. 22-1 at 26–27 (referring only to Lacey's March 2021 report of discrimination).) And the defendant does not contend with the timing of Goggins' firing.

There is no precise cutoff for the difference in time between the protected activity and the adverse employment action. The Sixth Circuit has stated, however, that a "two-month lapse between a plaintiff's protected activity and occurrence of the materially adverse action may be sufficient to satisfy a plaintiff's *prima facie* case of retaliation." *Barrow v. City of Cleveland*, 773 F. App'x 254, 264 (6th Cir. 2019); *cf. Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir.

---

adverse action or issues written corrective action are not adverse actions for purposes of retaliation claims under Title VII." (citation omitted)); *Lynn v. City of Lansing*, No. 1:19-CV-39, 2022 WL 19408552, at *7 (W.D. Mich. Mar. 24, 2022) ("[E]ven in the context of a retaliation claim, written reprimands do not constitute adverse employment actions without some additional material consequence." (citing *Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013))); *Alessio v. United Airlines, Inc.*, No. 5:17-CV-1426, 2018 WL 902334, at *5 (N.D. Ohio Feb. 15, 2018) (noting that warnings do not constitute adverse employment actions for purposes of a retaliation claim, and collecting cases).

2022) ("[T]hree months passed between [the plaintiff's] complaint to [his employer] and his termination, a firm indicator of a lack of a causal link."). Thus, without sufficient argument from the defendant, and construing the record in the light most favorable to the plaintiffs, the court finds that the plaintiffs have made out a *prima facie* case of retaliation based on the timing of their terminations.

### 2. Proffered reason

Because the plaintiffs have established a *prima facie* case of retaliation, the burden shifts back to the employer to articulate a non-retaliatory basis for its termination of the plaintiffs. As the court has discussed, Hotel Indigo has proffered a non-retaliatory reason for the plaintiffs' terminations, so the burden shifts back to the plaintiffs to show that they were terminated in retaliation for their complaints about workplace discrimination.

### 3. Pretext

The analysis of pretext in retaliation claims is similar to that in discrimination claims, except that the plaintiff must show that "retaliation was the real reason" for her termination. *Robinson*, 821 F. App'x at 530 (quoting *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012)). "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Hartman*, 657 F. App'x at 452 (quoting *Seeger*, 681 F.3d at 285).

At the pretext stage, the plaintiffs cannot rely on temporal proximity alone. *Ingram v. Regano*, No. 24-3761, 2025 WL 488618, at *3 (6th Cir. Feb. 13, 2025) ("[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012))). "However, 'suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.'" *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Bell v. Prefix, Inc.,* 321 F. App'x 423,

30

431 (6th Cir. 2009)). The plaintiffs do not make an argument that their terminations were pretextual for retaliation distinct from their arguments that their terminations were pretextual for discrimination.[26] For the reasons the court has discussed regarding the plaintiffs' discrimination claims, the plaintiffs' "inability to show pretext means that [their] retaliation claim[s] 'must fail.'" *Broadnax v. Rhombus Energy Sols., Inc.*, No. 25-1171, 2025 WL 2933015, at *5 (6th Cir. Oct. 15, 2025) (*Beny v. Univ. of Mich.*, 2025 WL 2124175, at *7 (6th Cir. July 29, 2025)). Accordingly, the plaintiffs' remaining retaliation claims will be dismissed.

## V.    CONCLUSION

The plaintiffs' discrimination and retaliation claims will be dismissed. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

---

[26] The RSUMF contains an allusion to an additional basis for pretext that the plaintiffs do not develop in their Response. As the court has described above, Goggins' July 2022 "Final Warning" indicates that it was originally intended as a termination notice. (*See* Doc. No. 22-11 (noting the "reason for termination").) The parties agree that Bacelieri changed his mind about terminating Goggins' employment, and the plaintiffs concede that this fact makes up part of their retaliation argument. (RSUMF ¶ 59.) The plaintiffs contend that Bacelieri's decision not to terminate Goggins in July 2022 constituted a "threat of termination . . . intended to create a 'chilling effect' designed to discourage Goggins from engaging in protected activity." (Doc. No. 25 at 27.) But the plaintiffs do not explain how Bacelieri's decision to give Goggins a second chance, as she wrote on the written warning document, could constitute retaliation.

31